***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the deputy commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the deputy commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the parties at relevant times.
3. The carrier on the risk for workers' compensation purposes is N.C. Forestry Mutual Insurance Company.
4. The alleged injury occurred on or about 8 August 2001.
5. Plaintiff's average weekly wage at the time of the accident was $575.00, which yields a corresponding compensation rate of $383.35.
6. Plaintiff started losing time from work on 19 August 2001 and has not returned to work for defendant-employer. Defendant-employer continued plaintiff's wages through 18 January 2002. Plaintiff has not received wages, compensation benefits or unemployment benefits of any type since 19 January 2002.
7. The parties have been correctly designated and there is no question as to nonjoinder or misjoinder of parties.
8. In addition to the deposition transcripts and the exhibits attached thereto, the parties stipulated into evidence in this matter Stipulated Exhibits 1 and 2, which consist of, respectively, plaintiff's medical records and his recorded statement.
9. The issues to be determined are whether plaintiff sustained a compensable injury or injuries by accident and, if so, to what medical and indemnity compensation is he entitled.
 ***********
Based on the foregoing stipulations and the evidence the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing before the deputy commissioner, plaintiff was 52 years old. He completed the eleventh grade in school. Prior to the dates of the alleged injuries herein, plaintiff had worked for approximately eight years as a truck driver for defendant-employer, a business owned by plaintiff's brother. Plaintiff's duties required him to drive the company truck and make deliveries. Occasionally, plaintiff was responsible for loading wooden bed frames onto the truck prior to delivery.
2. Plaintiff is claiming that he sustained two injuries by accident arising out of and in the course of his employment with defendant-employer. Plaintiff testified that on or about 8 August 2001 he was loading the delivery truck with wooden bed frames. These frames, which are each approximately six inches high and weigh thirty to thirty-five pounds, were stacked up fifteen high, as was standard procedure. Plaintiff was pushing the stack of frames up the incline into the trailer bed of the truck when the top frame hit the handle of the trailer's door and slid out away from the other frames as plaintiff continued to push the stack of frames. Plaintiff testified that he was facing the frames and looking down when the accident occurred. The T-rail of the top frame fell and struck plaintiff in the back and neck, knocked him down, and pinned him to the ground.
3. Plaintiff further testified that this incident was witnesses by at least two people, a former and a present co-worker. However, plaintiff's former co-worker, Chris Owens, testified that he saw plaintiff go in the truck, heard the frame fall and plaintiff hollering. When he went to investigate, he found plaintiff on the floor of the truck on his knees with the frame on top of him. He did not see the frame fall. Owens assisted plaintiff in removing the frame off of him and getting to his feet. Owens further testified that he saw plaintiff report the incident to the plant manager, Eric Harold, and he heard Harold say to plaintiff that he had to wait thirty days to file a claim.
4. Other witnesses testified that later that day they heard or plaintiff told them that a frame had fallen on him and struck him either on the head or neck. Despite plaintiff and Owens's testimony, however, Eric Harold testified that plaintiff did not report this incident to him on the day that it occurred. Based on the greater weight of the evidence, plaintiff did report the incident involving the bed frame falling on top of him to Eric Harold, the plant manager, on the same day it happened.
5. Plaintiff continued to work after the 8 August 2001 frame incident. On or about 15 August 2001, plaintiff made a trip to Fayetteville. While plaintiff was either driving to or from Fayetteville in the course and scope of his employment, he encountered exceptionally bumpy roads because of road construction. At some point during the trip, plaintiff's truck hit a bump in the road. The bump caused plaintiff's neck to snap and he felt immediate pain. The Form 19 for the 15 August 2001 injury, which was completed on 13 September 2001, gives a different version of how plaintiff's injury occurred. The Form 19 indicates that plaintiff had to slam on his brakes to avoid a collision and that this action aggravated plaintiff's neck problems which had increased in intensity since the frame incident a week before. The Full Commission gives greater weight to the evidence indicating that the incident occurred when plaintiff hit a bump in the road, and the Full Commission hereby so finds.
6. When plaintiff returned to defendant-employer's plant after the trip to Fayetteville, he had to be helped out of the truck cab. Plaintiff reported the injury to the safety manager, who filled out and signed an accident report form. Shortly thereafter, plaintiff told his brother about his injury while making a delivery to Fayetteville.
7. Plaintiff presented to Dr. Henry Pool on 16 August 2001. Dr. Pool's medical notes do not indicate that plaintiff told him that he was injured as a result of being hit by the falling bed frame or from hitting the bump in the road. Instead, the medical notes indicate that plaintiff only complained of worsening neck and upper extremity pain. In the course of his deposition testimony, however, Dr. Pool recalled that at some point, plaintiff mentioned something about a work injury and that he had filled out a workers' compensation report. Plaintiff did not initially intend to file a workers' compensation claim in this matter, and filed his initial medical bills with his general health insurance.
8. Plaintiff reported to his brother and sister-in-law (defendant-employer's secretary and treasurer) that he wanted to file a workers' compensation claim on or about 13 September 2001 after Dr. Pool had recommended surgery. At this time, plaintiff's sister-in-law completed the Form 19 report. While both plaintiff's brother and sister-in-law had been aware of plaintiff's injury while making the delivery to Fayetteville and plaintiff's ongoing and increasing complaints of neck pain, neither had been informed of the bed frame incident. Defendant-carrier denied plaintiff's claim for workers' compensation benefits.
9. Plaintiff has a long history of cervical spine problems. Plaintiff was injured in a softball game in August 1994 and thereafter was diagnosed with significant cervical spondylosis and a paracentral disc protrusion at C5-6. Eventually, plaintiff came under the care of Dr. Russell Admundson, a neurosurgeon, who performed an anterior microdiscectomy with allograft fusion at C5-6 on 23 February 1996. A subsequent x-ray of plaintiff's cervical spine on 26 March 1996 revealed marked changes of spondylosis at C4-5 with spurs causing marked narrowing. Dr. Admundson released plaintiff on 24 April 1996, cautioning him against "overdoing it."
10. After April 1996, plaintiff received periodic treatment from Dr. Richard Escajeda, his family physician, for complaints of neck pain and depression. In April 2000, Dr. Escajeda's notes reference plaintiff's history of a failed cervical laminectomy, bilateral arm itching secondary to nerve impingement, and increasing complaints of neck pain. Dr. Escajeda referred plaintiff to Dr. Pool after a 12 June 2000 MRI revealed severe degenerative changes throughout the cervical spine.
11. Dr. Pool examined plaintiff on 20 June 2000. At this time, plaintiff reported a history of progressive neck pain post-operatively that was intermittently severe, as well as some paresthesias and unusual pruritic (itching) pain involving his left upper extremity. Dr. Pool noted that plaintiff had severe kyphotic angulation (bending of the cervical spine) at C5-6 caused by incorrect healing of the previous surgery, and severely degenerated discs at C4-5 and C6-7. Dr. Pool gave plaintiff the option of another surgical procedure, warning that the surgery would be very involved and would carry significant risk. Plaintiff was instructed to consider his options and let Dr. Pool know his decision. Plaintiff continued to work and did not return to Dr. Pool until 16 August 2001, eight days after being hit by the falling bed frame and one day after the Fayetteville trip when he hit a bump in the road and his neck snapped.
12. On 16 August 2001 when plaintiff presented to Dr. Pool, he complained of increased neck and upper extremity pain, including increased difficulty with dysesthetic sensations in both arms. Dr. Pool ordered a myelogram and CT scan. These tests showed kyphosis at C5-6 and very severe degenerative changes throughout the cervical spine, as well as chronic instability at C4-5 and C5-6. While these diagnostic tests were different types of tests from the MRI done in June 2000, the new tests revealed no obvious structural changes within plaintiff's neck. However, plaintiff's symptomatology had progressed significantly. Dr. Pool recommended and plaintiff agreed to additional surgery.
13. On 19 September 2001, Dr. Pool performed a C4-5 and C6-7 anterior cervical discectomy and fusion surgery with allograft and anterior plate instrumentation from C4 to C7 on plaintiff. Plaintiff initially did reasonably well after surgery. However, his recovery was not as well as expected, with continued neck pain and upper extremity paresthesias and dysesthesias and some degree of instability at C6-7. Ultimately, Dr. Pool recommended and performed repeat surgery. Plaintiff underwent a posterior cervical fusion on 7 May 2002. This surgical procedure has given plaintiff partial relief of his symptoms, but as of 16 January 2003, plaintiff continued to have significant pain problems.
14. Dr. Pool testified by deposition on 11 February 2003. He anticipated that plaintiff would be released from his care in May 2003 and assigned a twenty-five percent (25%) permanent partial impairment rating to plaintiff's back. Dr. Pool also believed that plaintiff would need to undergo a functional capacity evaluation to determine his physical capacities. Plaintiff had not been released to return to work in any capacity as of 11 February 2003. Thus, there is no evidence in the record that plaintiff has reached maximum medical improvement.
15. Dr. Pool testified that in his opinion, it was reasonable to conclude that either of the two injuries (8 August 2001 or 15 August 2001) described by plaintiff could have aggravated his pre-existing condition and resulted in the need for his surgery on 19 September 2001. Dr. Pool further testified that plaintiff's worsened condition in 2001 could have occurred due to natural progression and worsening of plaintiff's underlying degenerative condition without any traumatic incident occurring. Based on the greater weight of the evidence, the Full Commission finds that plaintiff's underlying, preexisting condition was materially aggravated by plaintiff's August 2001 accidents and resulted in his need for surgery on 19 September 2001.
16. There is insufficient evidence of record from which the Full Commission can find and hold by the greater weight that plaintiff, by filing a workers' compensation claim, was out to get his brother for personal animosities stemming from issues relating to their parents' assets.
17. Based on the totality of the evidence presented, the Full Commission hereby finds that plaintiff sustained an injury by accident arising out of and in the course of his employment on 8 August 2001 as a result of being struck on the back and neck by a falling bed frame and on 15 August 2001 when his neck snapped after hitting a bump in the road while making a delivery to Fayetteville.
18. As a result of his 8 and 15 August 2001 injuries by accident, plaintiff was unable to work from 19 August 2001 and continuing. Defendant-employer continued paying plaintiff's salary until 18 January 2002.
19. Plaintiff is entitled to receive temporary total disability compensation in the amount of $383.35 per week from 18 January 2002 and continuing until further order of the Commission.
20. Plaintiff is entitled to the payment of medical expenses incurred for the treatment of his injury by accident so long as the treatment is reasonably required to effect a cure, give relief, and/or lessen plaintiff's disability.
21. Plaintiff's average weekly wage at the time of the accident was $575.00, which yields a corresponding compensation rate of $383.35.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of his employment on 8 August 2001 as a result of being struck on the back and neck by a falling bed frame and on 15 August 2001 when his neck snapped after hitting a bump in the road while making a delivery to Fayetteville. N.C. Gen. Stat. § 97-2(6).
2. As a direct result of the 8 August 2001 and 15 August 2001 work-related injuries, plaintiff was temporarily and totally disabled from work from 19 August 2001 and continuing. N.C. Gen. Stat. § 97-29.
3. Plaintiff received salary continuation from 19 August 2001 to 19 January 2002. Plaintiff is entitled to temporary total disability compensation in the amount of $383.35 per week from 19 January 2002 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
4. As the result of his 8 August 2001 and 15 August 2001 injuries by accident, plaintiff is entitled to have defendant-employer pay for all related medical expenses incurred or to be incurred in the future that are reasonably required to effect a cure, provide relief or lessen plaintiff's disability. N.C. Gen. Stat. §§ 97-25; 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant-employer shall pay to plaintiff temporary total disability compensation at the rate of $383.35 per week for the period from 19 January 2002 and continuing until further order of the Commission. The accrued compensation shall be paid to plaintiff in a lump sum.
2. A reasonable attorney fee in the amount of 25% of the compensation awarded to plaintiff is approved and allowed for plaintiff's counsel payable as follows: twenty-five percent (25%) of the accrued compensation due plaintiff shall be deducted and paid directly to plaintiff's attorney and thereafter, every fourth compensation check due plaintiff shall be paid directly to plaintiff's counsel.
3. Defendant-employer shall pay for all of plaintiff's medical expenses incurred or to be incurred in the future which are related to her compensable injury when bills have been submitted according to Commission procedure.
4. Defendant-employer shall pay the costs of this action.
This the ___ day of April 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/____________ LAURA MAVRETIC COMMISSIONER